J-S12017-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.H.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.J., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3184 EDA 2019 |

Appeal from the Decree October 23, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000715-2019

BEFORE:   SHOGAN, J., McCAFFERY, J., and COLINS, J.[*]

MEMORANDUM BY McCAFFERY, J.:                    **FILED APRIL 13, 2020**

A.J. ("Mother") appeals from the decree entered in the Philadelphia Court of Common Pleas, granting the petition of the Philadelphia Department of Human Services ("DHS") to terminate her parental rights to her minor, dependent son, A.H.D. ("Child"), born in January 2017, pursuant to subsections 2511(a)(1), (2), (5), (8), and (b) of the Adoption Act.[1]  In addition, counsel for Mother, Neal Masciantonio, Esquire ("Counsel"), has filed

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 23 Pa.C.S. §§ 2101-2938.  By separate decrees entered the same date, the trial court also involuntarily terminated the parental rights of Child's father, A.D. ("Father"), pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b), and Unknown Father pursuant to 23 Pa.C.S. § 2511(a)(1), (2), and (b). Neither Father nor Unknown Father has filed a separate appeal or participated in the instant appeal.

a petition to withdraw and **Anders**[2] brief in this Court. We grant Counsel's

petition to withdraw, and affirm the trial court's decree.

The trial court summarized the procedural and factual history as follows:

This family has been known to DHS since 2013, pursuant to [ ] valid General Protective Services ("GPS") reports after Mother tested positive for marijuana at the birth of Child's siblings[.] DHS has previously implemented In-Home Protective Services ("IHPS") for the family in 2013.

On January 19, 2017, Mother gave birth to Child. At the time of his birth, Mother admitted that she had used phencyclidine ("PCP") in August 2016. Mother also indicated that none of Child's siblings were in her care. At the time of Child's birth, Mother was receiving inpatient substance abuse treatment at Gaudenzia New Image.

On January 25, 2017, a Single Case Plan ("SCP") was created. Mother's objectives were to comply with all services that were recommended from her assessment and to sign a release of information to Community Umbrella Agency ("CUA") [Asociación Puertorriqueños en Marcha] ("APM"); comply with Gaudenzia program for therapeutic services; provide updates on prenatal documentation and sign releases; locate safe and appropriate housing with the Achieving Reunification Center ("ARC"); and attend the Clinical Evaluation Unit [("CEU")] for monitoring. The SCP was revised on March 27, 2017. Mother's objectives were to comply with all services that were recommended from the assessment and sign a release of information for CUA APM; comply with the Gaudenzia House program, policies, drug screens, and sign appropriate releases; comply with all treatment services, including following recommendations and signing releases; comply with the Mercy Hospice drug and alcohol program, which include[s] drug screens and transitional housing; follow the Gaudenzia program for therapeutic services; attend Caring Together through Mercy Hospice for dual diagnosis services; provide updates on prenatal documentation and sign releases; locate safe and appropriate housing with the ARC; attend the

---

[2] **Anders v. California**, 386 U.S. 738 (1967).

Clinical Evaluation Unit [ ] for monitoring; keep Child safe; not to leave the facility with Child; and follow the safety plan from CUA APM.  On November 26, 2017, CUA learned that Mother had not been compliant with her drug and alcohol treatment program.  On November 27, 2017, CUA learned that Mother had re-enrolled in drug and alcohol treatment through the Northeast Treatment ("NET") center.

On January 19, 2018, Mother tested positive for marijuana and PCP at NET.  On January 30, 2018, CUA learned that Mother had voluntarily left treatment at the NET and begun treatment at the Caring Together treatment program.  On February 12, 2018, CUA learned that Mother had not been attending and was not compliant with the Caring Together drug treatment program.  On that same day, DHS contacted Mother *via* telephone.  Mother indicated to DHS that she was attending Caring Together, but she had not been signing in upon her arrival and that the Caring Together's records did not accurately reflect her attendance.

On February 21, 2018, Mother was discharged from substance abuse treatment at Caring Together.  Mother had previously refused drug screenings at the CEU on multiple occasions, most recently on October 2, 2017.  Mother had also not made herself available to the CEU for an assessment.  Additionally, Mother refused to release Child's current medical records to DHS and did not have appropriate sleeping arrangements for Child at her home.  Mother also failed to attend a scheduled appointment with the Philadelphia Housing Authority ("PHA") for housing.  On March 9, 2018, DHS filed a dependency petition for Child.

On March 13, 2018, an adjudicatory hearing was scheduled for Child.  Mother was not present for this hearing.  The trial court granted a continuance and ordered that an Order of Protective Custody ("OPC") be obtained forthwith for Child with police assist, if necessary.  On that same date, DHS obtained an OPC for Child.  Child was subsequently transported by DHS to the Philadelphia Police Department and placed with [an aunt ("Paternal Aunt")].

On March 15, 2018, a shelter care hearing was held for Child.  Mother was not present for this hearing.  The trial court lifted the OPC and ordered the temporary commitment to DHS to stand.  The trial court referred Mother to the CEU for a forthwith drug screen and a dual diagnosis assessment.

> On April 3, 2018, an adjudicatory hearing was held for Child. Mother was present for this hearing. Child was adjudicated dependent and fully committed to DHS. The trial court discharged the temporary commitment to DHS. The trial court referred Mother to the CEU for a forthwith drug and alcohol screen, dual diagnosis assessment, and three random drug screens. Additionally, Mother was ordered to attend weekly supervised visits with Child at the agency for one hour. Mother was required to confirm her visits 24 hours in advance and if she appeared under the influence, her visits were to be suspended until further order of the court.

Trial Ct. Op., 12/19/19, at 1-5 (footnotes omitted).

Throughout the next year, the trial court conducted permanency review hearings, maintaining Child's placement and permanent placement goal. Thereafter, on September 25, 2019, DHS filed petitions to involuntary terminate Mother's and Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b), and for a goal change. A combined termination/goal change hearing was conducted on October 23, 2019. Mother was present and represented by counsel. While not present, Father was represented by counsel. Child was represented by a child advocate, Lawrence J. O'Connell, Esquire, as well as legal counsel, Michael Gessner, Esquire, during this proceeding. In support of its petition, DHS presented the testimony of Nakeisha Evans, a case manager for APM. DHS additionally presented Exhibits DHS-1 through DHS-15, which were admitted without objection. N.T., 10/23/19, at 9. Legal counsel for Child made an offer of proof as to the testimony of Roya Pallor, a social worker who visited Child in his

resource home with his paternal aunt, and admitted Ms. Pallor's report as Exhibit LC-1. *Id*. at 33-34. Further, Mother testified on her own behalf.

By decree dated and entered October 23, 2019, the trial court involuntarily terminated the parental rights of Mother pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b).[3] On November 12, 2019, Mother, through appointed counsel, filed a timely notice of appeal, as well as a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). As stated above, Counsel has filed an *Anders* brief and petition to withdraw from representation in this Court.

When counsel files an *Anders* brief, this Court may not review the merits of the appeal without first addressing counsel's request to withdraw. *Commonwealth v. Washington*, 63 A.3d 797, 800 (Pa. Super. 2013). This Court has extended the *Anders* principles to appeals involving the termination of parental rights. *In re V.E. & J.E.*, 611 A.2d 1267, 1275 (Pa. Super. 1992). Counsel appointed to represent an indigent parent on appeal from a decree involuntarily terminating parental rights may therefore petition this Court for leave to withdraw representation and submit an *Anders* brief. *In re S.M.B.*,

---

[3] By separate order dated and entered the same date, the court changed Child's permanent placement goal to adoption. *See* Permanency Review Order, 10/23/19. Mother did not appeal from this order, and this memorandum, therefore, only addresses the termination of parental rights. *See* Pa.R.A.P. 903(a) ("Except as otherwise prescribed by this rule, the notice of appeal. . .shall be filed within 30 days after the entry of the order from which the appeal is taken.").

*A.M.B., & G.G.B.*, 856 A.2d 1235, 1237 (Pa. Super. 2004). Our Supreme Court has explained, "the major thrust of *Anders* . . . is to assure that counsel undertakes a careful assessment of any available claim that an indigent appellant might have." *Commonwealth v. Santiago*, 978 A.2d 349, 358 (Pa. 2009). The Court stated that this "is achieved by requiring counsel to conduct an exhaustive examination of the record and by also placing the responsibility on the reviewing court to make an independent determination of the merits of the appeal." *Id.*

> To withdraw, counsel must:
>
> 1) petition the court for leave to withdraw stating that, after making a conscientious examination of the record, counsel has determined that the appeal would be frivolous; 2) furnish a copy of the [*Anders*] brief to the [appellant]; and 3) advise the [appellant] that he or she has the right to retain private counsel or raise additional arguments that the [appellant] deems worthy of the court's attention.

*Commonwealth v. Cartrette*, 83 A.3d 1030, 1032 (Pa. Super. 2013) (*en banc*) (citation omitted).

> [I]n the *Anders* brief . . . counsel must: (1) provide a summary of the procedural history and facts, with citations to the record; (2) refer to anything in the record that counsel believes arguably supports the appeal; (3) set forth counsel's conclusion that the appeal is frivolous; and (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

*Santiago*, 978 A.2d at 361. Counsel must "attach to their petition to withdraw a copy of the letter sent to their client advising him or her of their rights." *Commonwealth v. Millisock*, 873 A.2d 748, 752 (Pa. Super. 2005).

"Once counsel has satisfied the above requirements, it is then this Court's duty to conduct its own review of the trial court's proceedings and render an independent judgment as to whether the appeal is, in fact, wholly frivolous." *Commonwealth v. Goodwin*, 928 A.2d 287, 291 (Pa. Super. 2007) (*en banc*) (citation omitted).

Here, Counsel has filed a petition to withdraw. While Counsel does not indicate as such in his petition, in his brief filed contemporaneously with his petition, he asserts that he has made a conscientious review of the record and determined the appeal would be frivolous. *Anders* Brief at 12-13. Additionally, Counsel has filed an *Anders* brief that complies with the requirements set forth in *Santiago*. Finally, Counsel attached to his petition a copy of a letter advising Mother of her rights pursuant to *Millisock*. Hence, we conclude that Counsel has complied with the procedural *Anders* requirements and proceed to a review of the merits.

Counsel's *Anders* brief raises the following issues for our review:

1. Whether the trial court committed reversible error, when it involuntarily terminated [M]other's parental rights where such determination was not supported by clear and convincing evidence under the [A]doption [A]ct, 23 [Pa.C.S.[ ] § 2511(a)(1)], and (2), (5) and (8)[?]

2. Whether the trial court committed reversible error when it involuntarily terminated [M]other's parental rights without giving primary consideration to the effect that the termination would have on the developmental, physical and emotional needs of the child as required by the [A]doption [A]ct, 23 [Pa.C.S. § 2511(b)?]

*Anders* Brief at 6.

In matters involving involuntary termination of parental rights, our standard of review is as follows:

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations omitted). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G. & J.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa. Super. 2003) (citation omitted).

The termination of parental rights is governed by Section 2511 of the Adoption Act and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his

- 8 -

or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*) (citation omitted).

In the case *sub judice*, the trial court terminated Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). In order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, we analyze the court's termination decree pursuant to subsections 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> \* \* \*
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

- 9 -

\* \* \*

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

**See** 23 Pa.C.S. § 2511(a)(2), (b).

This Court has stated:

In order to terminate parental rights pursuant to 23 Pa.C.S.[ ] § 2511(a)(2), the following three elements must be met:  (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

**In re Adoption of M.E.P.**, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted).  "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct.  To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties."  **In re Adoption of C.D.R.**, 111 A.3d 1212, 1216 (Pa. Super. 2015), *quoting* **In re A.L.D.**, 797 A.2d 326, 337 (Pa. Super. 2002).  "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities.  [A] parent's vow to cooperate, after a long

period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." ***In re A.L.D.***, 797 A.2d at 340 (quotation marks and citations omitted).

In the case at bar, in finding grounds for termination of Mother's parental rights pursuant to Section 2511(a)(2), the trial court stated:

> Throughout the time that [Child has] been in DHS custody, Mother's SCP objectives were dual diagnosis, random screens, parenting, housing, employment, and visitation. Mother's objectives have remained the same throughout the life of the case and Mother was aware of her objectives. Mother has failed to successfully complete any of her objectives throughout the life of the case. Mother was enrolled in a drug and alcohol program at Caring Together, but Mother was kicked out of the program on March 26, 2019. Mother claims that she's participated in multiple drug and alcohol programs throughout the life of the case, but confirmed that she was kicked out of the program at Caring Together after a verbal altercation with staff members. Mother has not provided a random drug screen since October 2018. Mother's drug screen on March 16, 2018, was positive for marijuana and PCP. Mother's drug screen on October 10, 2018,[4] was positive for PCP. Mother is not enrolled in any programs, including parenting, housing, or employment. Mother's current home is inappropriate for reunification. The home lacks gas service, a refrigerator, and furniture. Any beds in the home were on the floor and held up by milk crates. Mother is offered weekly supervised visits with Child at the agency. Mother last visited Child in May 2019, six months prior to the termination trial on October 23, 2019. Mother's visits have never expanded beyond supervised at the agency due to Mother's noncompliance with her SCP objectives. Prior to May 2019, Mother was substantially consistent with visits. Mother informed CUA that she was unable to visit Child since May 2019 because she had a funeral to attend in May 2019, and that she was sick between June and August of 2019. At the termination trial, Mother stated that she was unable to attend visits with Child because she was out of state for approximately one month in May 2019 and because she was

_____

[4] Mother tested positive for PCP on October 1, 2018. ***See*** Exhibit DHS-9.

assigned a new CUA case worker in June 2019. Mother admitted that she never attempted to contact her attorney when she was having trouble contacting the CUA case worker. Mother has been non-compliant with the permanency plan for the life of the case. Child needs permanency, which Mother cannot provide. Mother has not performed any type of parental duties or responsibilities for the last six months and the issues that brought Child into care have not been resolved by Mother. Child has been in DHS care since March 13, 2018, nineteen months at the time of the termination trial on October 23, 2019. Mother had ample opportunity to put herself in a position to parent, but has not done so throughout the life of the case. Mother's repeated and continued incapacity has not been mitigated. The DHS witness was credible. Mother has demonstrated that she is unwilling to remedy the causes of her incapacity to parent in order to provide Child with essential parental care, control, or subsistence necessary for his physical and mental well-being. Termination under 23 Pa.C.S.[ ] §2511(a)(2) was also proper.

Trial Ct. Op. at 9-10 (citations to record omitted).

A review of the record supports the trial court's finding of grounds for termination under Section 2511(a)(2). The record reveals that Mother failed to complete her objectives aimed at reunification with Child and remedy the conditions that brought Child into care. Child came into care as a result of Mother's substance abuse issues. N.T. at 11-12. In fact, Mother testified that she was pregnant with and had Child with her while engaged in several substance abuse treatment programs. *Id.* at 30. CUA case manager, Nakeisha Evans, recounted that Mother's objectives included obtaining a dual diagnosis assessment through CEU, as well as random drug screening; attending ARC for parenting, housing, and employment, and obtaining stable housing and employment; and attending visitation with Child. *Id.* at 11. Ms. Evans indicated that Mother was aware of these objectives through herself as

well as other CUA workers. *Id.* at 11-12. Significantly, Ms. Evans flatly confirmed that Mother did not meet these objectives aimed at reunification. *Id.* at 12. In noting that Mother's visitation never progressed beyond supervised visitation,[5] Ms. Evans stated, "Mom has not been compliant with any of her goals. And she still was testing positive for substance abuse."[6] *Id.* at 13. Similarly, in responding to why the agency now longer wants to pursue reunification between Mother and Child, Ms. Evan explained, "Because Mom has not been compliant with any of her objectives." *Id.* at 15. Further, Ms. Evans acknowledged that Mother had not remedied the issues that brought Child into care and was not currently engaged in any programs aimed at doing so. *Id.* at 23. Ms. Evans indicated that Mother had not remained consistent with respect to contact with the agency. *Id.* at 16.

Specifically, Mother last provided a drug screen in October 2018. N.T. at 27. By Mother's own admission, she had been in and out of treatment programs and had been "kicked out" of a program at Caring Together on March 26, 2019.[7] *Id.* at 25-26, 30-31. Importantly, Ms. Evans testified that when

_____

[5] Mother last visited Child in May 2019. N.T. at 12, 15.

[6] As indicated, Mother tested positive for PCP on October 1, 2018. *See* Exhibit DHS-9.

[7] Mother was discharged from Caring Together as she got into an argument with a staff member. N.T. at 31.

she asked Mother about participation in a mental health/drug and alcohol program, Mother would not give a real response, but would frame it in terms of whether Ms. Evans wanted her to do so. *Id.* at 14, 26-27. Mother's housing was also reported as "inappropriate."[8] *Id.* at 14. Lastly, as indicated, Mother's visitation never progressed beyond supervised and she last visited with Child in May 2019.[9] *Id.* at 13.

Hence, the record substantiates the conclusion that Mother's repeated and continued incapacity, abuse, neglect, or refusal has caused Child to be without essential parental control or subsistence necessary for his physical and mental well-being. *See In re Adoption of M.E.P.*, 825 A.2d at 1272. Moreover, Mother cannot or will not remedy this situation. *See id*. As we discern no abuse of discretion or error of law, we do not disturb the trial court's findings. Furthermore, as we agree with the trial court's findings for termination under Subsection 2511(a)(2), we need not address any further subsections of Section 2511(a). *See In re B.L.W.*, 843 A.2d at 384.

---

[8] Ms. Evans described, "The house [] is inappropriate. It had no gas; no refrigerator. There was no furniture in the house. The beds was [sic] on the floor. [Child's maternal grandmother] slept in the living room as soon as you walked through on a thin mattress holding [sic] up by three crates." *Id.* at 14.

[9] Ms. Evans testified that Mother reported having a funeral in May and being sick in June and July, and again in August. N.T. at 24. Mother confirmed that she had a funeral in Maryland in May, and then reported difficulties due to a change in CUA workers. She, however, admitted that she never contacted her attorney if she was experiencing any difficulties with resumption of visitation. *Id.* at 28-29, 32.

We next determine whether termination was proper under Section 2511(b). As to Section 2511(b), our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." [We have] held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. However, as discussed below, evaluation of a child's bonds is not always an easy task.

*In re T.S.M.*, 71 A.3d at 267 (citations omitted). "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008) (citation omitted).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d at 1121 (citations omitted).

Moreover,

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and

- 15 -

> should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

*In re Adoption of C.D.R.*, 111 A.3d at 1219 (quotation marks and citations omitted).

In finding that Child's emotional needs and welfare favor termination pursuant to Section 2511(b), the trial court reasoned as follows:

> Mother is offered weekly supervised visits with Child at the agency. Mother last visited Child in May 2019, six months prior to the termination trial on October 23, 2019. Mother's visits have never expanded beyond supervised at the agency due to Mother's noncompliance with her SCP objectives. Prior to May 2019, Mother was substantially consistent with visits. Mother informed CUA that she was unable to visit Child since May 2019 because she had a funeral to attend in May 2019, and that she was sick between June and August of 2019. At the termination trial, Mother stated that she was unable to attend visits with Child because she was out of state for approximately one month in May 2019 and because she was assigned a new CUA case worker in June 2019. Mother admitted that she never attempted to contact her attorney when she was having trouble contacting the CUA case worker. Mother has been non-compliant with the permanency plan for the life of the case. Child is currently placed with Paternal Aunt, who is the adopt[ive] parent of Child's other biological siblings. Child has been placed with Paternal Aunt for nineteen months, more than half of Child's life, and the placement is a pre-adoptive home. Child has a close parent-child bond with Paternal Aunt and refers to her as "mom." Paternal Aunt meets Child's daily needs. Child would not suffer any irreparable harm if Mother's parental rights were terminated and it is in Child's best interest to be freed for adoption. Any bond that Mother has with Child is extremely attenuated due to Mother's failure to visit with Child since May 2019. On behalf of Child's legal counsel for the termination proceedings ("Legal Counsel"), a social worker visited Child in the home of Paternal Grandmother on the day of the termination trial to determine his wishes regarding placement. Child is two-year[s]-old. The social worker observed that Child shows verbal and nonverbal signs of attachment with Paternal Aunt and his siblings that reside in the home. This home is the

- 16 -

only home that Child knows and Child knows Paternal [Aunt] as his mother. Child is safe in the home with his needs met. Child is too young to understand or verbalize his wishes for permanency. The DHS witness and the report of the social worker was credible. The trial court's termination of Mother's parental rights to Child under 23 Pa.C.S.[ § 2511(b)] was proper and there was no error of law or an abuse of discretion.

Trial Ct. Op. at 14-15 (citations to record omitted).

We agree. As to subsection 2511(b), upon review, we again discern no abuse of discretion. The record supports the trial court's finding that Child's developmental, physical and emotional needs and welfare favor termination of Mother's parental rights pursuant to Section 2511(b). *See T.S.M.*, 71 A.3d at 267.

Significantly, CUA case manager, Nakeisha Evans, testified that Child does not have a relationship with Mother. N.T. at 15. At the time of the hearing, Mother's visitation had not progressed beyond supervised and she had last visited with Child in May 2019. *Id.* at 12-13, 15. Further, Child does not ask for Mother. *Id.* at 23.

Moreover, Child had been in his current pre-adoptive kinship home for nineteen months and was doing well with his needs met. N.T. at 15-17. When asked to describe the interaction between Child and his kinship provider, his paternal aunt, Ms. Evans testified, "They have a close bond. He actually calls her 'Mom.'" *Id.* at 16. Ms. Evans explained that Child looks to his kinship provider, his paternal aunt, for support and to meet his daily needs and that he shares his primary parental relationship with her. *Id.* at 17. In fact, in

responding that Child does not ask for Mother, Ms. Evans stated, "No. His mom is [Paternal Aunt]." *Id.* at 23. Importantly, Child's brother and sisters, also adopted by the paternal aunt, are also in the kinship resource home. *Id.* at 16. Likewise, Roya Pallor, social worker, opined that Child "is verbally and non-verbally attached to the caregiver who has been able to provide a safe and loving environment and that there seems to be a bond between the child and the current caregiver." *Id.* at 33; *see also* Exhibit LC-1. As such, Ms. Evans opined that Child would not suffer harm if Mother's parental rights were terminated. *Id.* at 17. She further stated that it would be in Child's best interests to be freed for adoption. *Id.* When asked why, Ms. Evans, responded, "All because of Mom's past history: Not being compliant. Not being compliant on visitations. If — and he [has] been in care with his current caregiver for almost half his life." *Id.* at 17-18 (emphasis omitted).

While Mother may profess to love Child, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *See In re Z.P.*, 994 A.2d at 1121. At the time of the hearing, Child had been in placement for nineteen months, and is entitled to permanency and stability. As we stated, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *Id*. at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or

her potential in a permanent, healthy, safe environment." ***In re B., N.M.***, 856 A.2d 847, 856 (Pa. Super. 2004) (citation omitted).

Based on the foregoing independent analysis of the trial court's termination of Mother's parental rights, we agree with counsel for Mother that the within appeal is wholly frivolous.[10]  As such, we affirm the decree of the trial court, and grant Counsel's petition to withdraw.

Decree affirmed.  Petition to withdraw granted.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 4/13/20

---

[10] Further, we note that our independent review of the record did not reveal any additional, non-frivolous issues overlooked by counsel.  ***See Commonwealth v. Flowers***, 113 A.3d 1246, 1250 (Pa. Super. 2015).